# IN THE COURT OF APPEALS OF IOWA

No. 20-0144
Filed April 14, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**JAMES ARVIN BOEHMER,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Floyd County, Christopher C. Foy, Judge.

James Boehmer appeals his convictions and sentences for indecent contact with a child and lascivious conduct with a minor. **CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED FOR ENTRY OF A CORRECTED SENTENCING ORDER.**

Frank J. Nidey and Charles D. Paul of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Doyle, P.J., and Tabor and Ahlers, JJ.

**DOYLE, Presiding Judge.**

A jury found James Boehmer guilty of indecent contact with a child and lascivious conduct with a minor. The district court sentenced Boehmer to two years in prison, and one year in jail to run consecutive to the prison sentence. On appeal, Boehmer claims the district court erred in admitting evidence of law enforcement attempts to contact him through his lawyer for an interview before deciding to file charges. Boehmer also contends the court erred in sentencing him to one year in jail to be served consecutively to his prison sentence. We conclude it was not error to admit evidence of pre-charging law enforcement efforts to contact Boehmer, and even if it was error, it was harmless. It was error to impose a consecutive prison-jail sentence. We affirm Boehmer's convictions but remand for an order correcting Boehmer's sentence.

## I.    Facts and Proceedings.

Boehmer's step-daughter, a minor, reported to her sister, her mother (Boehmer's wife), and then to a school counselor, incidents of sexual abuse by Boehmer. The school counselor reported the information to the Child Protection Center (CPC). The girl was interviewed by the CPC. A report was generated and sent with the video interview to the Floyd County Sheriff's Office. Deputy Sheriff Jeremy Iriarte[1] was assigned the case. The Iowa Department of Human Services (DHS) was also involved at this point. Deputy Iriarte coordinated his investigation with the Floyd County Attorney's Office and DHS worker Tracy Smed. Smed previously interviewed the girl's mother and had the CPC report. A joint interview

---

[1] At the time of trial he was Chief of the Nashua Police Department.

with Boehmer was planned. The deputy allowed Smed to contact Boehmer first to schedule the interview. After a time, Smed reported to the deputy that she did not receive any correspondence back from Boehmer but did receive correspondence from a law firm representing Boehmer. Shortly afterward, Smed reported to the deputy that she had been in contact with the law office and was told she would get a call back. When that did not happen, the deputy contacted the law firm himself. He told a legal assistant that he wanted to set up an interview with Boehmer and requested a call back or an email with dates to do an interview. He did get a voicemail call back. The deputy was told the law firm represented Boehmer, but no further information was provided. The deputy talked to the legal assistant again, provided his contact information, and requested dates and times for an interview. The deputy never got an interview with Boehmer. Deputy Iriarte then consulted with the Floyd County Attorney's Office. Criminal complaints were filed against Boehmer and he was later charged by trial information.

The State charged Boehmer with lascivious acts with a child, indecent contact with a child, and lascivious conduct with a minor. A jury found Boehmer not guilty of lascivious acts with a child but found him guilty of indecent contact with a child and lascivious conduct with a minor.

## II.    Standard of Review

We review constitutional challenges de novo. *State v. Wickes*, 910 N.W.2d 554, 564 (Iowa 2018). We review a district court's decision to admit or exclude evidence for an abuse of discretion. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). A challenge alleging that a sentence is illegal is reviewed for errors at law.

*See State v. Patterson*, 586 N.W.2d 83 (Iowa 1998) (citing *State v. Kappell*, 510 N.W.2d 878, 879 (Iowa 1994)).

## III.  Analysis.

### A.  Evidentiary claims.

On appeal, Boehmer argues the district court erred by allowing the State to present, as substantive evidence of guilt in its case-in-chief, the fact that Boehmer relied on his rights to counsel and to remain silent before his arrest.  The State counters the court did not err in permitting the State to present evidence that law enforcement had attempted to contact Boehmer through his lawyer for an interview, before deciding to file charges.

Boehmer moved in limine to exclude from evidence, among other things, "statements, documents or items from any witness regarding the contacts that occurred between any law enforcement officers and [Boehmer]'s attorney's office." This request was denied before trial.  But the court made it clear that Boehmer was

> free to raise objections in the course of testimony as to any other matters that are referenced in his motions in limine that the Court has not specifically acted on.
> And if the Court—if Defendant wishes to raise or assert error on appeal as to any evidentiary matters, then the objections will have to be made on the record in the course of trial.

During her opening statement, the prosecutor said:

> You'll also get to hear from Investigator, now he's the chief of police in Nashua, Jeremy Iriarte.  At the time, he was in the Floyd County Sheriff's Office.  And he'll talk to you about his investigation, his attempts to talk to the defendant to get his side of the story, as well as his coordination with Tracy Smed, who was doing an investigation as well, and the information he gathered from her.

Defense counsel made no objection.  During his opening, defense counsel alluded to a flawed investigation by the State.  During a break in the middle of the trial, the

parties discussed various evidentiary issues with the court. Defense counsel referred to the prosecutor's opening statement and

> just wanted to make sure that, ultimately, we were not going to be eliciting testimony from [Chief Iriarte] that encroached on Mr. Boehmer's, you know, essentially, rights to remain silent as far as at the time of his arrest. I didn't want it to be, well, you know, he wouldn't give me a statement; or he said that he wasn't going to give any statements; or anything like that.

In responding, the prosecutor said:

> And I would be asking [Chief Iriarte] what attempts he made to get into contact with the defendant. I anticipate he would answer that he was informed the defendant had an attorney so he had left messages with the defendant—with [defense counsel's] office; and that's all the further he would go.
> I think it's important he be able to tell that to the jury because the jury is, otherwise, going to wonder why didn't you even try to talk to the defendant; and they need to know he made attempts to do so.

The court agreed the information "would be relevant because the jury would wonder, if nothing was said about the investigating officer attempting to communicate with a person who was a suspect at that time." The court suggested the prosecutor visit with Chief Iriarte before he testified to make sure he was careful to not make any comments that would suggest Boehmer declined to give a statement, or refused to give a statement, or exercised his constitutional rights. The back-and-forth discussion continued. Defense counsel was concerned the information would lead a jury to think Boehmer was hiding something or unwilling to say something, putting him in a position to "make some sort of explanation that he spoke with his attorney and his attorney advised him not to make any statements." He argued "we don't put defendants on the spot for exercising their Constitutional rights." The State countered:

to prevent [Chief Iriarte] from saying that he tried to have some communication with the defendant is very prejudicial to the State because then the jury is going to be left with this image that no investigation was done, that we did this knee-jerk reaction after hearing only one side, filed a charge, and didn't do anything else. And that is incredibly unfair to the State. That's not what happened in this case.

After the dust settled, the court ruled:

I appreciate that we're in somewhat of a gray area. The fact that the officer attempted to communicate with Mr. Boehmer, I believe, is relevant. At the same time, we have to be careful that no comment is made on what appeared to be the decision of Mr. Boehmer to exercise his Fifth Amendment rights and not speak with the investigating officer.

In this instance, because the officer never spoke directly to Mr. Boehmer, only left messages on a cell, what he believed to be Mr. Boehmer's cellphone number, and then after learning that Mr. Boehmer had counsel, the efforts were directed toward [defense counsel]—

. . . .

. . . [I]t would be the Court's opinion that, and the Court's ruling, that the officer can testify about his efforts to contact Mr. Boehmer. Here, because there was never any direct interaction between Mr. Boehmer and the officer, it would be the Court's opinion it would not be—it would not inevitably lead a jury to conclude that Mr. Boehmer was refusing to speak with police.

And then once the request was made of Counsel, again, that's not a direct communication between law enforcement and Mr. Boehmer. And I think for that reason, it's not as likely that a juror would necessarily conclude that—that Mr. Boehmer was refusing to speak with law enforcement.

. . . .

. . . [G]iven the lack of direct contact or communication between Mr. Boehmer and the officer, that the testimony from the officer relating to his efforts to contact Mr. Boehmer would not unfairly impinge on—I mean, obviously, Mr. Boehmer exercised his Fifth Amendment rights. He did not speak with law enforcement before charges were filed. And at most, the jury is going to have the information that efforts were made for contact. They were not responded to, and no explanation was provided.

And it seems to me that if—if Mr. Boehmer wishes to provide that explanation, he has that right, [defense counsel]. But to simply, you know, all that we're talking about here is that the officer gets to talk about the steps he took in his investigation; and I do believe that if he's not allowed to discuss that he—or testify to the fact that he did

make efforts to communicate with Mr. Boehmer before charges were filed, that in itself would lead to questions in the jury's mind, and I see this as probably the most appropriate way to deal with it.

Trial resumed and Chief Iriarte was called to testify. Central to this appeal is the following testimony by Chief Iriarte:

Q. So what did you do next, at that time? A. At that point, I coordinated with Tracy Smed, the DHS worker, about conducting an interview with James Boehmer. I allowed Tracy to contact James first and schedule an interview with James. And she reported back to me that she did not receive any correspondence back from James. However, she did receive a correspondence back from a law firm representing James Boehmer.

Q. What did you do then? A. At that point, I followed up with Tracy shortly after to see if she had gotten in contact with the attorney's office. She reported to me that she had contacted them and would receive a call back. Several days later, I followed up with her. She had not received any correspondence back so I took it upon myself to contact the attorney's office representing James Boehmer; and I got into contact with the assistant for [defense counsel], and she took down my contact information; and I requested a call back or email regarding the dates that I would like to do an interview with James.

Q. And did you hear back from the law office? A. I did get a phone call back from the law office. I got a voicemail. And in the voicemail, it stated that they are the legal representation, legal representatives of James Boehmer and that no other further information was provided as far as a date that they—that I had provided them for an interview.

Q. Did you make any other attempts to set up an interview? A. Yes. Following that voicemail, I made contact with the attorney's office again. Got in contact with the assistant and again provided my information and requested dates and times for an interview with James Boehmer.

Q. And ultimately, did you ever have an interview set up? A. No. I never got an interview with James Boehmer.

Boehmer did not object to the testimony as it came in or challenge it as being beyond the scope of the court's ruling. The subject was never mentioned to the jury again—not during cross-examination of Boehmer and not during closing arguments.

Setting aside any error-preservation issues, we address the merits of Boehmer's claims. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999). Boehmer first asserts the district court erred in allowing the State to present, as substantive evidence of guilt in its case in chief, the fact that he relied on his right to counsel before his arrest. His point hinges on *State v. Nelson*, 234 N.W.2d 368 (Iowa 1975). In that case, the district court admitted evidence offered by the State that, while a warrant search of the defendant's home was in progress, two attorneys arrived, one being counsel who represented defendant at trial. *Id.* at 372. In resisting a motion in limine, the State argued "the arrival of two attorneys on the scene while the search warrant was in progress is indicative of some awareness on the part of the defendant that what he had in his possession was stolen property." *Id.* The State switched gears on appeal and intimated the testimony about the attorneys' presence was not offered to raise an inference of defendant's guilt. *Id.* The supreme court found the fact's relevancy to any issue in the case was indiscernible. *Id.* The court sidestepped the issue as to whether the incident rose to a constitutionally protected right to counsel. *Id.* at 372-73. But the *Nelson* court concluded,

> the court should not penalize [Nelson] by allowing the State to show the presence of the lawyers when such evidence could have no purpose other than to raise an inference of guilt in the jurors' minds. As a matter of public policy, neither trial court rulings nor our decisions should unnecessarily discourage lay persons from seeking advice and assistance of counsel in important and serious legal procedures.

*Id.* at 373 (citations omitted). This case is different. Unlike in *Nelson*, the challenged evidence here had a purpose other than to just raise an inference of guilt in the jurors' minds. The evidence of the deputy's contact with the law office

representing Boehmer was offered to show what investigative efforts the State took before charging Boehmer—the efforts criticized by Boehmer as being subpar. So its relevance is discernible here. And this case is different from *State v. Rai*, No. 09-1207, 2010 WL 2925851 (Iowa Ct. App. July 28, 2010). There, relying on *Nelson*, we concluded a "prosecutor acted improperly when she elicited testimony and presented argument about Rai's decision to have an attorney accompany him during his pre-arrest interview with police." *Id.* at *8. When examining the police officer, the *Rai* prosecutor asked, "[W]ould you consider it to be a red flag to have an attorney and a defendant contact you at the beginning of an investigation and want to come in and talk?" *Id.* "Later, in closing argument, the prosecutor asked the jury to consider, 'And if you've gone to all the effort to get your lawyer to come in here to tell me this, then maybe you got something to hide.'" *Id.* We noted the "references to an attorney were not merely in passing but were meant to disparage Rai's credibility and imply that he had something to hide because he did not appear unrepresented." *Id.* Here there was no suggestion made to the jury that because Boehmer "lawyered up" he had something to hide. And again, the evidence was offered to counter an argument the State's pre-charging investigation was somehow lacking. It was offered and admitted to show that the deputy attempted to gather relevant information from everyone who was likely to have it. We find no error in the district court's allowing the evidence in.

To be sure, Chief Iriarte could have testified about his unsuccessful efforts to contact Boehmer without mentioning the law firm. But the State did not belabor the point that Boehmer had counsel before his arrest. It was not mentioned during the State's opening. It was not raised during the State's cross-examination of

Boehmer. It was not argued or mentioned during the State's closing argument or rebuttal. Boehmer himself testified on direct examination that he contacted counsel sometime after DHS worker Smed talked to his wife. So even if admission of the evidence were error, it was harmless under the unique circumstances presented.

Boehmer also argues the district court erred by allowing the State to present, as substantive evidence of guilt in its case in chief, the fact that Boehmer relied on his Fifth Amendment right to remain silent before his arrest.[2] But there is no "fact" that Boehmer expressly invoked his Fifth Amendment right to remain silent. The only facts presented were that Boehmer did not respond to DHS's request for an interview. DHS received correspondence from Boehmer's law firm. After contacting the law firm, the deputy was unable to arrange an interview with Boehmer. No reason was given. From these facts—that Boehmer hired counsel and that the deputy was unable to schedule an interview with Boehmer—one can only assume Boehmer invoked his Fifth Amendment right to remain silent. While not an unreasonable assumption, it is not enough. A defendant's silence is not an exercise or invocation of the privilege against self-incrimination. *Salinas v. Texas*, 570 U.S. 178, 186-87 (2013) (plurality opinion). Here, there was no express invocation of the right. So Boehmer's Fifth Amendment claim fails. *Id.* at 186 (concluding, because defendant failed to invoke his Fifth Amendment privilege,

---

[2] "[T]he Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980); *accord State v. Goodrich*, No. 00-1644, 2002 WL 984477, at *4 (Iowa Ct. App. May 15, 2002) (citing *Jenkins*); *cf. Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (holding Fifth Amendment guaranty against self-incrimination prohibits impeachment based on a criminal defendant's silence after receipt of *Miranda* warnings).

"the prosecution's use of his noncustodial silence did not violate the Fifth Amendment").

Nor did the State use the evidence to argue adverse inferences from Boehmer's prearrest silence.[3]  The testimony was elicited to counter Boehmer's argument that the State rushed to judgment without conducting a full investigation. The evidence was not argued—and was not even mentioned during the State's closing and rebuttal—as evidence of Boehmer's guilt.  We find no error in the district court allowing the evidence in.  And if admission of the evidence was error, it was harmless under the unique circumstances presented.

**B.  Sentencing.**

On the conviction for indecent contact with a child, the court imposed a two-year indeterminate term of incarceration in "the custody of the director of the Iowa Department of Corrections."  On the lascivious conduct with a minor conviction, the district court sentenced Boehmer to a one-year term of incarceration "in the Floyd County Jail or an alternate facility designated by the sheriff."  The district court set the terms to run consecutively.

Both parties agree that the consecutive sentences should have melded into a single three-year sentence, in the custody of the Iowa Department of Corrections, under Iowa Code sections 901.8 and 903.4 (2019).  We agree.  *See State v. Kapell*, 510 N.W.2d 878, 880 (Iowa 1994).  Boehmer requests we vacate his sentences

---

[3] "[T]here are cases allowing the State to argue adverse inferences from a defendant's prearrest silence when the defendant did not invoke his or her Fifth Amendment rights in response to questioning." *State v. Gibbs*, 941 N.W.2d 888, 898 (Iowa 2020) (citing *Salinas*, 570 U.S. at 186).  Not all states have followed *Salinas*.  *See, e.g., State v. Tsujimura*, 400 P.3d 500, 520 (Haw. 2017).

and remand for resentencing. The State requests we vacate that part of the sentencing order naming the Floyd County Jail as the place for Boehmer's confinement and remand for entry of a corrected sentencing order. Full resentencing is not required. We therefore remand with directions to the district court to vacate that portion of the sentencing order that requires Boehmer to serve in the Floyd County Jail and to enter a corrected sentencing order consistent with this opinion. We affirm Boehmer's convictions.

**CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED FOR ENTRY OF A CORRECTED SENTENCING ORDER.**